**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NORTHBROOK PARK DISTRICT, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MR. DAVID'S FLOORING INTERNATIONAL, LLC, DIVERZIFY+ LLC f/k/a MR. DAVID'S FLOORING INTERNATIONAL, LLC, PCI FLORTECH INC., VORTEX COMMERCIAL FLOORING, INC., CONSOLIDATED CARPET ASSOCIATES, LLC, MICHAEL P. GANNON, DELMAR E. CHURCH, JR., ROBERT A. PATREY, JR., and KENNETH R. SMITH,<br><br>Defendants. | Civil Action No. 20-cv-07538<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Northbrook Park District ("Plaintiff") hereby brings this action, on behalf of itself and all persons and entities similarly situated, against Defendants Mr. David's Flooring International, LLC, Diverzify+ LLC f/k/a Mr. David's Flooring International, LLC, PCI FlorTech Inc., Vortex Commercial Flooring, Inc., Consolidated Carpet Associates, LLC, Michael P. Gannon, Delmar E. Church, Jr., Robert A. Patrey, Jr., Kenneth R. Smith (collectively, "Defendants") and co-conspirators. Plaintiff alleges, based on information and belief and investigation by counsel except where specifically alleged on the basis of personal knowledge, as follows:

## I.     NATURE OF THIS ACTION

1.      This class action is brought on behalf of Northbrook Park District and all persons and entities who purchased commercial flooring services and products in the United States directly from one or more of the Defendants from at least January 1, 2009 through the present (the "Class Period").

2.      Defendants are providers of commercial flooring services and products. Generally, commercial flooring providers remove any pre-existing flooring products at a job site, prepare a floor surface for installation and install new flooring products, including but not limited to carpet, wood, vinyl, tile and laminate flooring products.

3.      Plaintiff alleges that Defendants unlawfully conspired and reached an agreement to rig bids and fix prices of commercial flooring services and products sold in the United States in violation of Section 1 of the Sherman Antitrust Act. Plaintiff further alleges that Defendants and their co-conspirators took affirmative measures to fraudulently conceal the true nature of their illegal conduct from Plaintiff and other members of the Class in furtherance of their conspiracy. The combination and conspiracy engaged in by the Defendants and their co-conspirators was *per se* unlawful.

1

4.     Since at least the start of 2009, Defendants have conspired to inflate, fix, raise, maintain or artificially stabilize prices of commercial flooring services and products (the "Conspiracy"). In furtherance of their Conspiracy, Defendants: (i) attended meetings and engaged in private conversations to discuss methods for rigging bids and fixing prices of commercial flooring services and products; (ii) reached agreements to rig bids and fix prices of commercial flooring services and products sold in the United States; (iii) exchanged pricing and other confidential information to facilitate coordination for commercial flooring services and products to be sold in the Unites States; (iv) allocated potential customers and markets by determining in advance which flooring co-conspirator would win a particular project or business; and (v) sold commercial flooring services and products at collusive and noncompetitive prices in accordance with their agreement.

5.     The existence of the Defendants' criminal Conspiracy has been confirmed by the Antitrust Division of the United States Department of Justice (the "DOJ"), whose ongoing investigation has resulted in criminal charges and guilty pleas involving several individuals and entities in the commercial flooring industry.

6.     To date, the DOJ has criminally charged five executives and two flooring providers with conspiring to suppress and eliminate competition in the commercial flooring industry by agreeing to rig bids and to fix prices of commercial flooring services and products sold in the United States. All of these executives and co-conspirator companies have pled guilty to illegally fixing the prices of commercial flooring services and products in violation of federal antitrust laws.

7.     Defendants' price-fixing conspiracy has had a widespread effect in the marketplace for commercial flooring services and products, including exploiting park districts and recreational facilities. Indeed, the DOJ has emphasized that "[a]ny collusion by commercial flooring

2

contractors exploits local communities whose schools, hospitals, charities, and businesses are entitled to the benefits of competitive bidding. The Justice Department and our law enforcement partners will bring contractors to justice when they cheat rather than compete." Further, the DOJ has publicly stated that it is continuing to investigate criminal conduct in the commercial flooring industry and expects to file additional criminal charges against other individuals and entities in the future.

8.      Defendants' collusive actions have had the intended effect of artificially inflating the prices of commercial flooring services and products. As a direct result of Defendants' unlawful conduct, Plaintiff and the Class members have paid higher, supracompetitive prices for commercial flooring services and products than they would have paid in a competitive market, and therefore have suffered injury to their business and property.

## II.      JURISDICTION AND VENUE

9.      Plaintiff brings this action on behalf of itself and all similarly situated persons and entities under Section 16 of the Clayton Act, 15 U.S.C. § 26, to secure injunctive relief and damages in excess of $5,000,000 for Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

10.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

11.      Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in, are found in, or have an agent or transacted business in this District, and because a substantial portion of the affected interstate commerce was carried out in this District. Specifically, Defendants Mr. David's Flooring International, LLC, Diverzify+ LLC f/k/a Mr. David's Flooring

International, LLC, Vortex Commercial Flooring, Inc., and PCI FlorTech, Inc. each have their principal place of business in this District. Moreover, individual Defendants Michael P. Gannon, Delmar E. Church, Jr., Robert A. Patrey, Jr., and Kenneth R. Smith all reside in this District.

12. This Court has personal jurisdiction over each of the Defendants because, among other reasons, each one has (i) transacted business throughout the United States, including in this District; (ii) was a provider of commercial flooring services and products throughout the United States, including in this District; (iii) had substantial contacts with the United States, including in this District; and (iv) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable and intended effect of causing injury to the business or property of persons residing in, located in or doing business throughout the United States, including in this District.

13. The activities of Defendants and all co-conspirators alleged in this Complaint were within the flow of, were intended to, and had direct, substantial and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III. PARTIES

#### A. Plaintiff

14. Northbrook Park District is a municipal corporation that is authorized by the laws of the State of Illinois with its principal place of business in Northbrook, Illinois. Northbrook Park District directly purchased commercial flooring services and products at prices artificially inflated by one or more of the Defendants and their co-conspirators during the Class Period. Northbrook Park District has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

4

**B.     Defendants**

*Mr. David's Flooring & Diverzify*

15.     Mr. David's Flooring International, LLC ("Mr. David's Flooring") is an Illinois limited liability corporation with its principal place of business located at 865 W. Irving Park Road, Itasca, Illinois 60143. During the Class Period, Mr. David's Flooring sold commercial flooring services and products directly to members of the Class in the United States. In February 2020, Mr. David's Flooring entered into an asset purchase agreement with Diverzify+ LLC whereby Diverzify acquired and took over Mr. David's Flooring business operations.

16.     Michael P. Gannon ("Gannon") is an Illinois resident and resides in this District. At all relevant times, Gannon was the vice president of sales at Mr. David's Flooring.

17.     Diverzify+ LLC ("Diverzify"), formerly known as Mr. David's Flooring, International, LLC, is an Illinois limited liability corporation with its principal place of business located at 865 W. Irving Park Road, Itasca, Illinois 60143. In February 2020, Diverzify entered into an asset purchase agreement with Mr. David's Flooring whereby Diverzify acquired and took over Mr. David's Flooring business operations.

18.     By acquiring and taking over Mr. David's Flooring business operations, Diverzify became the successor to Mr. David's Flooring and is thus liable to Plaintiff and the Class for the unlawful, anticompetitive conduct alleged herein.

19.     As explained below, Gannon was the former vice president of sales for Mr. David's Flooring and was criminally charged by the DOJ in April 2019 for conspiring to rig bids and fix prices of commercial flooring services and products sold in the United States. The DOJ's criminal charges made it clear that Gannon and his employer, Mr. David's

5

Flooring, engaged in a conspiracy to suppress and eliminate competition in the commercial flooring market by rigging bids, submitting noncompetitive, complementary bids and fixing the prices of commercial flooring services and products in violation of federal antitrust laws. On April 18, 2019, Gannon pled guilty to the DOJ's criminal price-fixing charges.

20.     In order to shield its assets and avoid civil liability for its federal antitrust violations, in early 2020 Mr. David's Flooring re-branded and changed its name to Diverzify. On February 1, 2020, Diverzify entered into an asset purchase agreement with Mr. David's Flooring whereby Diverzify acquired and took over Mr. David's Flooring business operations.

21.     Given that Gannon had been criminally charged by the DOJ and pled guilty in April 2019, at the time Diverzify acquired and took over Mr. David's Flooring business operations in February 2020, Diverzify had actual and constructive knowledge of the criminal misconduct that had occurred at Mr. David's Flooring and its potential civil liability to victims of the price-fixing conspiracy. Gannon's plea agreement not only implicated Mr. David's Flooring but it also expressly stated that Gannon would be liable for "civil matters of any kind." As the DOJ's criminal charges alleged that Gannon was acting at the direction of his superiors at Mr. David's Flooring, Diverzify knew or should have known that Mr. David's Flooring would likely be held responsible for any civil liability imputed to Gannon.

22.     Further, at the time of the acquisition in February 2020, Diverzify also had actual and constructive knowledge of the DOJ's ongoing and widespread investigation into antitrust violations in the commercial flooring industry. First, Diverzify knew that Gannon, Mr. David's Flooring's former vice president of sales, was actively cooperating with the DOJ's antitrust investigation in accordance with his plea agreement. Second, in late 2019 Mr. David's Flooring's co-conspirator, Defendant PCI FlorTech Inc., was criminally charged and

pled guilty to the same price-fixing antitrust violations as Gannon. Similar to Gannon's guilty plea, PCI FlorTech's plea agreement expressly contemplated the possibility of civil action—such as the instant antitrust class action—and stated that the company would be liable for "civil matters of any kind."

23.     Additionally, since the time of the acquisition, Diverzify has continued to conduct business in the commercial flooring marketplace in the exact same manner as Mr. David's Flooring had previously operated. Other than the name change, Diverzify and Mr. David's Flooring are identical to one another and are one in the same.

24.     According to various Secretary of State records, beginning in February 2020 Diverzify was formed and registered to conduct business in numerous states. Several Secretary of State filings show that Diverzify's corporate registration paperwork was signed by Jordan Zmijewski, Mr. David's Flooring's former vice president of business development and son of Mr. David's Flooring owner Leonard Zmijewski.

25.     There is a substantial continuity of business operations between Diverzify and Mr. David's Flooring. Indeed, Diverzify has taken over Mr. David's Flooring corporate headquarters, website, products and equipment, clients, services and its business locations.

26.     Diverzify maintains its corporate headquarters and principal place of business at the same Itasca, Illinois address as Mr. David's Flooring, has the same telephone number as Mr. David's Flooring, its Internet website domain name (www.diverzify.com) is registered to Mr. David's Flooring and the content of the website is substantially similar to Mr. David's Flooring's former website (www.mrdavids.com) and it has the same registered agent. In fact, in an effort to advertise its expertise and experience in the commercial flooring industry,

Diverzify's website highlights many commercial flooring projects that were previously completed by Mr. David's Flooring personnel.

27.     After the acquisition, Diverzify continues to be owned and operated by the Zmijewski family. David and Leonard Zmijewski, former owners of Mr. David's Flooring, are listed as the contacts for Diverzify's member registration with the Professional Flooring Installers Association.

28.     Further, Diverzify has retained most of Mr. David's Flooring personnel, including many senior-level executives and officers. For example, Scott Day is currently employed as Diverzify's chief operating officer, and he formerly served in that same position for Mr. David's Flooring. Likewise, Julie McCollum is Diverzify's chief financial officer, the exact same position she formerly held with Mr. David's Flooring. Similarly, Jordan Zmijewski, a former vice president of Mr. David's Flooring, is also a vice president or manager of Diverzify.

29.     In addition to senior-level executives and management personnel, Diverzify also employs a significant number of former Mr. David's Flooring employees. For instance, Mr. David's Flooring former project manager Tammy McNeil, account executive William Wolfson and president of sales Bill Graves are all currently employed by Diverzify.

30.     Although Diverzify's acquisition of Mr. David's has been effectuated, Diverzify continues to operate as and enter into commercial flooring agreements on projects that were previously bid on by Mr. David's Flooring. In February and March 2020, William Wolfson signed various vendor agreements that were previously bid on by Mr. David's Flooring with a government cooperative purchase program for the Department of Texas Education for commercial flooring services and products.

31. Diverzify also holds itself out to the public as the same entity as Mr. David's Flooring. Many Diverzify employees have email addresses with domains of "@mrdavids.com" and "@diverzify.com." Moreover, as recent as September 2020, Diverzify personnel have been seen in the Chicagoland area operating motor vehicles bearing Mr. David's Flooring's logo for business purposes.

32. As Diverzify had sufficient notice of Mr. David's Flooring's antitrust civil liability and substantially continued Mr. David's Flooring's commercial flooring business operations after the acquisition, Diverzify is liable to Plaintiff and the Class as Mr. David's Flooring's successor.

33. Imposing federal successor liability over Diverzify is necessary to ensure that Plaintiff and the Class have an adequate remedy to recover damages in full. First, under federal antitrust laws, co-conspirators are jointly and severally liable for all damages caused by the unlawful conspiracy. Second, antitrust damages are trebled by right. *See* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained.").

34. As Mr. David's Flooring's assets were sold and its business operations were taken over by Diverzify, Mr. David's Flooring is no longer operating in the commercial flooring industry and likely does not have sufficient assets to pay a class-wide, trebled judgment. According to Illinois Secretary of State records, Mr. David's Flooring is no longer an active corporation and is not in good standing. Consequently, Plaintiff and the Class have no adequate remedy at law against Mr. David's Flooring for its significant civil liability in this antitrust class action.

35.     If Diverzify is not held liable as the successor to Mr. David's Flooring, Plaintiff and the Class will suffer irreparable harm and the ability to effectively vindicate their rights under federal antitrust laws would be adversely impacted.

**PCI FlorTech**

36.     PCI FlorTech Inc. ("PCI FlorTech") is an Illinois corporation with its principal place of business at 910 W. National Avenue, Addison, Illinois 60101. During the Class Period, PCI FlorTech sold commercial flooring services and products directly to members of the Class in the United States.

**Vortex Commercial Flooring & Consolidated Carpet**

37.     Vortex Commercial Flooring, Inc. ("Vortex Commercial Flooring") is an Illinois corporation with offices located at 25 Official Road, Addison, Illinois 60101 and 162 N. Franklin, Suite 500, Chicago, Illinois 60606. During the Class Period, Vortex Commercial Flooring sold commercial flooring services and products directly to members of the Class in the United States. In October 2019, Consolidated Carpet Associates, LLC entered into an asset purchase agreement with Vortex Commercial Flooring whereby Consolidated Carpet acquired and took over Vortex Commercial Flooring's business operations.

38.     Delmar E. Church, Jr. ("Church") is an Illinois resident and resides in this District. At all relevant times, Church was an owner and president at Vortex Commercial Flooring.

39.     Robert A. Patrey, Jr. ("Patrey") is an Illinois resident and resides in this District. At all relevant times, Patrey was an owner and executive vice president at Vortex Commercial Flooring.

40.     Kenneth R. Smith ("Smith") is an Illinois resident and resides in this District. At all relevant times, Smith was an owner and executive vice president at Vortex Commercial Flooring.

41.     Consolidated Carpet Associates, LLC ("Consolidated Carpet") is a New York limited liability corporation with its principal place of business located at 16 W. 22nd Street, 12th Floor, New York, New York 10010. In October 2019, Consolidated Carpet entered into an asset purchase agreement with Vortex Commercial Flooring whereby Consolidated Carpet acquired and took over Vortex Commercial Flooring's business operations.

42.     In order to shield its assets and avoid civil liability for its federal antitrust violations, in October 2019 Vortex Commercial Flooring sold its entire business to Consolidated Carpet. By acquiring and taking over Vortex Commercial Flooring's business operations, Consolidated Carpet became the successor to Vortex Commercial Flooring and is thus liable to Plaintiff and the Class for the unlawful, anticompetitive conduct alleged herein.

43.     As a result of the acquisition and resulting market presence in the Chicago, Illinois commercial flooring industry, Consolidated Carpet created a new business entity named Consolidated Flooring of Chicago, LLC. Consolidated Flooring of Chicago is led by Randy Rich and Kristy Burlingame, Vortex Commercial Flooring's former co-president and executive vice president.

44.     At the time of Consolidated Carpet's acquisition of Vortex Commercial Flooring in October 2019, Consolidated Carpet had actual and constructive knowledge of the DOJ's ongoing and widespread investigation into antitrust violations in the commercial flooring industry. As explained in detail below, the DOJ's antitrust investigation of providers of commercial flooring services and products became public in April 2019 when Gannon of Mr. David's Flooring was

11

criminally charged and pled guilty to participating in a conspiracy to suppress and eliminate competition in the commercial flooring market by rigging bids, submitting noncompetitive, complementary bids and fixing the prices of commercial flooring services and products in violation of federal antitrust laws. When the DOJ announced the criminal charges against Gannon, Assistant Attorney General Makan Delrahim stated that "[t]oday's charge is the first of what we expect to many in this ongoing investigation into bid rigging."

45.     Further, in late 2019 another commercial flooring co-conspirator, Defendant PCI FlorTech Inc., was criminally charged and pled guilty to the same price-fixing antitrust violations as Gannon of Mr. David's Flooring. In a press release announcing the criminal charges against PCI FlorTech, Assistant Attorney General Makan Delrahim stated that the DOJ's Antitrust Division would "continue to investigate and prosecute contractors and their executives who cheat in the bidding process."

46.     In light of the DOJ's widely-publicized antitrust investigation and considering the fact that Consolidated Carpet hired two of Vortex Commercial Flooring's executives to run its newly-created commercial flooring business entity, at the time of acquiring Vortex Commercial Flooring in October 2019, Consolidated Carpet undoubtedly knew that Vortex Commercial Flooring and its executives were under investigation for violations of federal antitrust laws and had significant potential civil liability to victims of the price-fixing conspiracy.

47.     On December 10, 2019, just two months after Consolidated Carpet acquired Vortex Commercial Flooring, the DOJ charged three executives of Vortex Commercial Flooring with conspiring to rig bids and fix the prices of commercial flooring services and products sold in the United States. All three Vortex Commercial Flooring executives, including its owners, president and executive vice presidents, have pled guilty to the criminal price-fixing charges.

48.     Additionally, since the time Consolidated Carpet acquired and took over the operations of Vortex Commercial Flooring, Consolidated Carpet has continued to conduct business in the Chicagoland commercial flooring marketplace.

49.     In a press release announcing the acquisition of Vortex Commercial Flooring, Consolidated Carpet's chief executive officer stated that "[a]cquiring the assets of Vortex will provide us a solid platform to expand the scope of our tried and true sales and operations model into one of the most significant commercial marketplaces in the country. The scale of our combined operation, as well as the sharing of our best practices, technology, and support services will fuel our growth and expand our market share in the evolving commercial flooring industry."

50.     There is a substantial continuity of business operations between Consolidated Carpet and Vortex Commercial Flooring. Indeed, Consolidated Carpet has taken over Vortex Commercial Flooring's corporate headquarters, products and equipment, clients, services and its business locations.

51.     As a result of the acquisition, Consolidated Carpet created Consolidated Flooring of Chicago, LLC, a wholly-owned subsidiary, to take over and operate Vortex Commercial Flooring's business operations. Consolidated Flooring of Chicago maintains its principal place of business at the same Addison, Illinois address that was previously used by Vortex Commercial Flooring prior to the acquisition.

52.     Further, Consolidated Flooring of Chicago has retained Vortex Commercial Flooring's senior-level executives and officers to manage the business and run the day-to-day operations. Randy Rich, Vortex Commercial Flooring's former co-president, currently serves as the president of Consolidated Flooring of Chicago. Moreover, Kristy Burlingame, Vortex

13

Commercial Flooring's former executive vice president, maintains the same position at Consolidated Flooring of Chicago.

53.     In addition to senior-level management, Consolidated Flooring of Chicago has also retained other former employees of Vortex Commercial Flooring. For example, Vortex Commercial Flooring's former project manager Jenn Stephens, proposal project manager Eric Huffman and project leader Lauren Enders are all currently employed by Consolidated Flooring of Chicago.

54.     As Consolidated Carpet had sufficient notice of Vortex Commercial Flooring's antitrust civil liability and substantially continued Vortex Commercial Flooring's commercial flooring business operations after the acquisition, Consolidated Carpet is liable to Plaintiffs and the Class as Vortex Commercial Flooring's successor.

55.     Imposing federal successor liability over Consolidated Carpet is necessary to ensure that Plaintiff and the Class have an adequate remedy to recover damages in full. First, under federal antitrust laws, co-conspirators are jointly and severally liable for all damages caused by the unlawful conspiracy. Second, antitrust damages are trebled by right. *See* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained.").

56.     As Vortex Commercial Flooring's assets were sold and its business operations were taken over by Consolidated Carpet, Vortex Commercial Flooring is no longer operating in the commercial flooring industry and likely does not have sufficient assets to pay a class-wide, trebled judgment. Consequently, Plaintiff and the Class have no adequate remedy at law against Vortex Commercial Flooring for its significant civil liability in this antitrust class action.

57.     If Consolidated Carpet is not held liable as the successor to Vortex Commercial Flooring, Plaintiff and the Class will suffer irreparable harm and the ability to effectively vindicate their rights under federal antitrust laws would be adversely impacted.

58.     "Defendant," when used, includes all of the Defendant's predecessors, including those merged with or acquired by any Defendant and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that provide commercial flooring services and products directly to purchasers in the United States during the Class Period.

### C.     Co-Conspirators

59.     Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the Conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether named as Defendants or not.

60.     There are numerous named and unnamed co-conspirator commercial flooring providers and executives that performed acts and made statements in furtherance of the Conspiracy. These include, but are not limited to, those companies that have been identified by the DOJ as co-conspirators (e.g., Company A, Company C, Company E, Company G, Company H) but have not been specifically named.

61.     Moreover, during the Class Period, Carter Brett ("Brett") was an account executive for Mohawk Carpet, LLC, a manufacturer of commercial flooring products located in the State of Georgia. On February 5, 2020, the DOJ filed criminal charges against Brett for conspiring to rig bids and fix prices of commercial flooring products and services, and for his role in a money laundering conspiracy involving kickbacks.

62.     According to the DOJ, Brett participated in a conspiracy with companies involved in the sale of commercial flooring products and services, including commercial flooring providers located in this District, for which the primary purpose was to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States.

63.     In furtherance of the conspiracy, Brett initiated and orchestrated an unlawful scheme to rotate winning bids for commercial flooring contracts that were to be performed in this District. Specifically, Brett offered preferential pricing to the co-conspirator commercial flooring provider that was designated to win a particular flooring contract, and then directed other co-conspirator flooring providers to submit noncompetitive, complementary bids so that the designated winning co-conspirator commercial flooring provider would have the lowest bid and be awarded the project.

64.     In exchange for Brett's preferential pricing on commercial flooring products, co-conspirator commercial flooring providers paid tens of thousands of dollars in kickbacks to a shell corporation created by Brett.

65.     In a DOJ press release issued in connection with Brett's criminal charges, Special Agent in Charge of the FBI's Chicago Field Division, Emmerson Buie Jr., stated, "[w]hen businesses rig bids to increase their own profits illegally, it is our citizens who suffer. Today's charges illustrate our ongoing efforts to protect Americans from price fixing and other dishonest business practices."

66.     On March 5, 2020, Brett pled guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States in violation of the Sherman Antitrust

Act. Pursuant to the terms of Brett's plea agreement, the DOJ will ask the Court to order Brett to pay a $10,000 criminal fine and receive a prison sentence of 16 months.

67.     According to Brett's plea agreement, Brett and his co-conspirators rigged bids and fixed the prices of commercial flooring products and services for more than 15 projects with a total value in excess of $600,000.

68.     Each Defendant and co-conspirator acted as the agent or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged by Plaintiff.

### IV.     COMMERCIAL FLOORING INDUSTRY BACKGROUND

69.     Commercial sites such as corporate offices, retail stores, hospitals, schools, park districts and recreational facilities are subject to high traffic patterns from thousands of people walking across the floor every day. Consequently, commercial spaces require a durable flooring product that can withstand heavy foot traffic over time.

70.     Providers of commercial flooring services and products remove any pre-existing flooring products at a job site, prepare a floor surface for installation and install new flooring products, including but not limited to carpet, wood, vinyl, tile, and laminate flooring products.

71.     Commercial sites where flooring services and products are removed and installed include schools, colleges, institutes, park and recreational facilities, retail stores, new construction sites, healthcare facilities, corporate offices and other locations.

72.     The demand for commercial flooring services and products is highly inelastic because there are no close substitutes. In a market where demand is inelastic, collusion is facilitated as consumers cannot substitute products. Thus, providers can raise prices to

17

supracompetitive levels and increase profits. In a market where demand is inelastic, purchasers are forced to pay these supracompetitive prices.

73.     Because commercial flooring services and products are essential components to any physical structure in addition to park and recreational facilities, Plaintiff and Class members were forced to purchase these products at supracompetitive prices throughout the Class Period.

## V.     OPPORTUNITIES TO CONSPIRE

74.     The Defendants in this matter have operated in the commercial flooring marketplace for many years and are no strangers to each other. Indeed, during the Class Period Defendants have had extensive interactions and communications with one another through joint ventures and commercial flooring trade associations.

75.     From 2006 to 2014, Defendants PCI FlorTech and Vortex Commercial Flooring operated a joint venture called PCI FlorTech/Vortex JV, LLC. According to Illinois Secretary of State records, the managers of the joint venture were Michael O'Connell, the former president of Defendant PCI FlorTech, and Defendant Church, the former owner and president of Vortex Commercial Flooring.

76.     Additionally, Defendants are members of the same commercial flooring trade associations and have attended industry events that provided the opportunity to meet, disguise their improper discussions and perform acts in furtherance of the Conspiracy. For example, Defendants are members of the Professional Flooring Installers Association (the "PFIA"), a trade association for Chicagoland commercial flooring providers and specialists. According to the PFIA's website, its officers and board of directors include:

- President: Tom Sheridan of Defendant PCI FlorTech;

- Vice President: Kristy Burlingame of Defendant Consolidated Carpet (formerly Defendant Vortex Commercial Flooring); and

- Joint Labor/Management Chair: Leonard Zmijewski of Defendant Diverzify (formerly Mr. David's Flooring).

77.     Defendants are also all members of the Starnet commercial flooring trade association, a large network of locally owned full-service commercial flooring contractors that service more than 300 locations throughout North America.

78.     Defendants have utilized the Starnet trade association as a method to meet with each other and discuss potential business opportunities. Dave Meberg, the president and chief executive officer of Consolidated Carpet, stated in a 2019 interview that he met several executives employed by Vortex Commercial Flooring through the Starnet trade association and developed a "great friendship with them over the years."

79.     After being introduced to one another through Starnet, Meberg further explained in the interview that: (i) Consolidated Carpet has had direct conversations with Vortex Commercial Flooring executives; (ii) the two flooring companies share several customers located throughout the country; and (iii) they routinely discussed the possibility of an acquisition.

80.     In October 2019, Consolidated Carpet announced that it entered into an asset purchase agreement with Vortex Commercial Flooring whereby Consolidated Carpet acquired and took over all of Vortex Commercial Flooring's business operations.

81.     When responding to questions regarding Consolidated Carpet's acquisition of Vortex Commercial Flooring, Meberg emphasized his long-standing relationship with Vortex and publicly praised the skills and efforts of Vortex's former owner and president, Defendant

19

Church. As explained below, Church is one of three Vortex Commercial Flooring executives that have been criminally charged by the DOJ and pled guilty to participating in an unlawful conspiracy to fix the prices of commercial flooring services and products sold throughout the United States.

## VI.   DEFENDANTS' ANTITRUST CONSPIRACY

82.     During the Class Period, Defendants and their co-conspirators formed a cartel to suppress and eliminate competition in the commercial flooring industry by agreeing to rig bids and fix the prices of commercial flooring services and products.

83.     Defendants and their co-conspirators participated in meetings, conversations and communications to discuss methods for rigging bids and fixing the prices of commercial flooring services and products sold in the United States.

84.     Defendants and their co-conspirators agreed, during those meetings, conversations and other communications, to rig bids and to fix the prices of commercial flooring services and products sold in in the United States.

85.     In furtherance of their unlawful Conspiracy, Defendants and their co-conspirators exchanged pricing and other confidential information for the purpose of fixing the prices of commercial flooring services and products sold to potential customers.

86.     By sharing pricing and other confidential information, Defendants and their co-conspirators allocated potential customers in the commercial flooring services and products marketplace and determined in advance which flooring contractor would submit the winning bid for a particular flooring job.

87.     Further, Defendants and their co-conspirators took affirmative steps to fraudulently conceal the true nature of their illegal conduct from Plaintiff and other members

of the Class. After designating which flooring contractor would submit the winning bid for a new project, the other co-conspirator flooring companies provided complementary, noncompetitive bids for commercial flooring services and products to potential customers.

88. Defendants' Conspiracy created the appearance that they were competing on price, but in reality they were unlawfully and artificially inflating the prices of commercial flooring services and products sold in the United States in violation of federal antitrust laws.

### VII.   THE GOVERNMENT'S ANTITRUST INVESTIGATION

89. The DOJ is conducting an ongoing antitrust investigation in the commercial flooring services and products industry. To date, the DOJ's investigation has resulted in criminal price-fixing charges against five commercial flooring executives and two flooring contractors. The DOJ has also indicated that it will bring additional criminal charges against other commercial flooring providers and executives in the near future.

90. Various corporations and individuals, both named and unnamed, have been identified as participating in the criminal Conspiracy.

91. Michael P. Gannon was a former vice president of sales at Mr. David's Flooring.

92. On April 3, 2019, the DOJ charged Defendant Gannon with participating in a combination and conspiracy with other companies and individuals to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States.

93. Gannon, acting on behalf of Mr. David's Flooring, submitted supracompetitive bids to potential customers for commercial flooring services and products. Further, to fraudulently conceal his unlawful conduct, Gannon submitted rigged bids and solicited

higher-priced, complementary bids from his co-conspirators so that Mr. David's Flooring would be the low bidder and win the contract award for a given flooring project.

94.     In announcing the criminal price-fixing violation against Gannon, Assistant Attorney General Makan Delrahim of the DOJ stated that "[t]oday's charge is the first of what we expect to be many in this ongoing investigation" and that the DOJ along with its law enforcement partners would "bring contractors to justice when they cheat rather than compete."

95.     The DOJ has made it clear that Gannon did not act alone. There were several other executives at Mr. David's Flooring that actively participated in the Conspiracy to rig bids and fix the prices of commercial flooring services and products sold in the United States.

96.     Mr. David's Flooring was owned by David, Leonard and Michael Zmijewski. According to the DOJ, during the Class Period, the owners of Mr. David's Flooring were co-conspirators with Gannon and were classified as Co-conspirator A1, Co-conspirator A2, and Co-conspirator A3.

97.     Additionally, other employees at Mr. David's Flooring also acted as co-conspirators including Co-conspirator A4, a sales manager, and Co-conspirator A5, a vice president.

98.     Gannon, acting on behalf of Mr. David's Flooring and at the direction of his superiors, carried out numerous unlawful acts in furtherance of the Conspiracy. At the request of Mr. David's Flooring's senior-level executives, including following instructions from an owner of Mr. David's Flooring named Co-conspirator A3, Gannon solicited complementary bids from other commercial flooring providers, submitted collusive, supracompetitive bids to

potential commercial flooring customers and performed other acts for the purpose of monitoring and enforcing adherence to the Conspiracy.

99.     On April 18, 2019, Gannon pled guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States in violation of the Sherman Antitrust Act. Pursuant to Gannon's plea agreement, the DOJ will ask the Court to order Gannon to pay a $28,000 criminal fine and receive a prison sentence of one year and a day.

100.     Gannon's participation in the Conspiracy was extensive and included the following acts in furtherance of the Conspiracy: he attended meetings and participated in conversations with representatives of other flooring contractors to discuss methods for rigging bids and fixing the prices of commercial flooring services and products. During these meetings and conversations, Gannon and his co-conspirators agreed to rig bids and fix the prices of commercial flooring services and products to be sold in the United States. Further, to carry out their unlawful Conspiracy, Gannon and his co-conspirators exchanged pricing and other confidential information to designate which flooring contractor would win a given project and enable co-conspirator companies to submit noncompetitive, complementary bids for commercial flooring services and products to potential customers.

101.     Gannon's plea agreement also outlines that he made decisions regarding bids that Mr. David's Flooring had rigged; submitted rigged bids on behalf of Mr. David's Flooring or caused others to submit rigged bids on behalf of Mr. David's Flooring; signed bids on behalf of Mr. David's Flooring that he knew were rigged; submitted, or directed his subordinates to submit, complementary bids on the behalf of other co-conspirator flooring companies; solicited, or directed his subordinates to solicit, complementary bids from other

co-conspirator flooring companies so that Mr. David's Flooring would be the low bidder for a given project; provided instructions to his subordinates on the methods, means and manner to rig bids; sold commercial flooring services and products to customers at collusive and noncompetitive prices; accepted payment for commercial flooring services and products at collusive and non-competitive prices; and communicated directly with executives, principals and managers of co-conspirator flooring companies for the purpose of monitoring and enforcing adherence to the Conspiracy.

102. On August 19, 2019, the DOJ charged Defendant PCI FlorTech with participating in a criminal conspiracy to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States.

103. Similar to Gannon's criminal information, the DOJ's charging document against PCI FlorTech states that PCI FlorTech and its co-conspirators carried out a criminal conspiracy by: (i) attending meetings and participating in private conversations to discuss methods for rigging bids and fixing prices of commercial flooring services and products; (ii) reaching an agreement to rig bids and fix prices of commercial flooring services and products sold in the United States; (iii) exchanging pricing and other confidential information to facilitate coordination for commercial flooring services and products to be sold in the United States; (iv) allocating potential customers and markets by determining in advance which commercial flooring co-conspirator would win a particular project or business; (v) soliciting noncompetitive, complementary bids to provide commercial flooring services and products to potential customers; (vi) submitting noncompetitive, complementary bids in furtherance of the Conspiracy; (vii) selling commercial flooring services and products at collusive and noncompetitive prices in accordance with the Conspiracy; and (viii) engaging in

conversations and other communications for the purpose of monitoring and enforcing adherence to the Conspiracy.

104.     Michael O'Connell served as president of PCI FlorTech from 1994 to 2017. According to the criminal charges filed by the DOJ against Gannon of Mr. David's Flooring, on numerous occasions, Gannon of Mr. David's Flooring solicited collusive, complementary bids from PCI FlorTech's former president, Co-conspirator C1. Further, during the Class Period Gannon had direct email correspondence with PCI FlorTech's executives, including its former and current president, regarding the rigging of bids and submission of supracompetitive pricing on commercial flooring projects that were to be performed in the United States.

105.     On September 19, 2019, PCI FlorTech pled guilty to the DOJ's criminal charges and agreed to pay a criminal fine of $150,000. In its plea agreement, PCI FlorTech admitted to participating in a conspiracy with other commercial flooring providers and executives to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States. In furtherance of the alleged Conspiracy, PCI FlorTech, including its former president and owner, exchanged confidential pricing information with other co-conspirator commercial flooring providers and submitted noncompetitive, complementary bids to potential customers in accordance with Defendants' conspiratorial agreements on commercial flooring contracts valued at millions of dollars.

106.     In a DOJ press release issued in connection with PCI FlorTech's guilty plea, Assistant Attorney General Makan Delrahim stated that PCI FlorTech and its co-conspirators "undermin[ed] the competitive process that consumers—including schools and charities—

depend upon to get a competitive price for flooring." Moreover, Federal Bureau of Investigation Special Agent Jeffrey S. Sallet exclaimed that "PCI FlorTech illegally conspired to elevate bid prices, ultimately cheating the public out of competitive pricing necessary to complete construction projects."

107. On December 10, 2019, the DOJ charged Vortex Commercial Flooring executives Patrey, Smith and Church with participating in a criminal conspiracy to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States. During the Class Period, Patrey and Smith were principal owners and executive vice presidents of Vortex Commercial Flooring while Church was a principal owner and president of Vortex Commercial Flooring.

108. The DOJ's charging document against Patrey, Smith and Church alleged that Vortex Commercial Flooring executives entered into in a combination and conspiracy with Defendants and other commercial flooring co-conspirator individuals and entities to fix the prices of commercial flooring services and products sold in the United States in violation of the Sherman Antitrust Act.

109. Nearly identical to the criminal charges against Gannon of Mr. David's Flooring and co-conspirator PCI FlorTech, the DOJ charging document against Patrey, Smith and Church alleged that these executives carried out a criminal conspiracy by: (i) attending meetings and participating in private conversations to discuss methods for rigging bids and fixing prices of commercial flooring services and products; (ii) reaching an agreement to rig bids and fix prices of commercial flooring services and products sold in the United States; (iii) exchanging pricing and other confidential information to facilitate coordination for commercial flooring services and products to be sold in the Unites States; (iv) allocating

potential customers and markets by determining in advance which flooring co-conspirator would win a particular project or business; (v) soliciting noncompetitive, complementary bids to provide commercial flooring services and products to potential customers; (vi) submitting noncompetitive, complementary bids in furtherance of the Conspiracy; (vii) selling commercial flooring services and products at collusive and noncompetitive prices in accordance with the Conspiracy; and (viii) engaging in conversations and other communications for the purpose of monitoring and enforcing adherence to the Conspiracy.

110. On February 27, 2020, Patrey pled guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States in violation of the Sherman Antitrust Act. Pursuant to Patrey's plea agreement, the DOJ will ask the Court to order Patrey to pay a $62,733.33 criminal fine and receive a prison sentence of one year and a day.

111. In his plea agreement, Patrey admitted that in furtherance of the alleged Conspiracy, he attended meetings and participated in conversations with other co-conspirators in order to discuss methods for rigging bids and fixing the prices of commercial flooring services and products to be sold in the United States. Further, to carry out their unlawful Conspiracy, Patrey and his co-conspirators exchanged pricing and other confidential information to designate which flooring contractor would win a given project and enable co-conspirator companies to submit noncompetitive, complementary bids for commercial flooring services and products to potential customers.

112. Patrey's participation in the Conspiracy was extensive and included the following acts in furtherance of the Conspiracy: he made decisions regarding bids that Vortex

Commercial Flooring had rigged; submitted rigged bids on behalf of Vortex Commercial Flooring or caused others to submit rigged bids on behalf of Vortex Commercial Flooring; signed bids on behalf of Vortex Commercial Flooring that he knew were rigged; submitted, or directed his subordinates to submit, complementary bids on the behalf of other co-conspirator flooring companies; solicited, or directed his subordinates to solicit, complementary bids from other co-conspirator flooring companies so that Vortex Commercial Flooring would be the low bidder for a given project; provided instructions to his subordinates on the methods, means and manner to rig bids; sold commercial flooring services and products to customers at collusive and noncompetitive prices; accepted payment for commercial flooring services and products at collusive and non-competitive prices; and communicated directly with executives, principals and managers of co-conspirator flooring companies for the purpose of monitoring and enforcing adherence to the Conspiracy.

113.    On March 9, 2020, Smith pled guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States in violation of the Sherman Antitrust Act. Pursuant to Smith's plea agreement, the DOJ will ask the Court to order Smith to pay a $62,733.33 criminal fine and receive a prison sentence of one year and a day.

114.    In his plea agreement, Smith admitted that in furtherance of the alleged Conspiracy, he attended meetings and participated in conversations with other Defendants in order to discuss methods for rigging bids and fixing the prices of commercial flooring services and products to be sold in the United States. Further, to carry out their unlawful Conspiracy, Smith and his co-conspirators exchanged pricing and other confidential information to designate which flooring contractor would win a given project and enable co-conspirator

28

companies to submit noncompetitive, complementary bids for commercial flooring services and products to potential customers.

115.    Smith's participation in the Conspiracy was extensive and included the following acts in furtherance of the Conspiracy: he made decisions regarding bids that Vortex Commercial Flooring had rigged; submitted rigged bids on behalf of Vortex Commercial Flooring or caused others to submit rigged bids on behalf of Vortex Commercial Flooring; signed bids on behalf of Vortex Commercial Flooring that he knew were rigged; submitted, or directed his subordinates to submit, complementary bids on the behalf of other co-conspirator flooring companies; solicited, or directed his subordinates to solicit, complementary bids from other co-conspirator flooring companies so that Vortex Commercial Flooring would be the low bidder for a given project; provided instructions to his subordinates on the methods, means, and manner to rig bids; sold commercial flooring services and products to customers at collusive and noncompetitive prices; accepted payment for commercial flooring services and products at collusive and non-competitive prices; and communicated directly with executives, principals, and managers of co-conspirator flooring companies for the purpose of monitoring and enforcing adherence to the Conspiracy.

116.    On March 9, 2020, the DOJ issued a press release in connection with Patrey's and Smith's agreements to plead guilty for their role in the antitrust criminal Conspiracy to rig bids and fix prices of commercial flooring services and products sold in the United States. Assistant Attorney General Makan Delrahim of the DOJ stated that "[t]he recent guilty pleas are the latest in the government's investigation, and they won't be the last."

117.    On August 27, 2020, the DOJ charged Defendant Vortex Commercial Flooring with participating in a criminal conspiracy to suppress and eliminate competition by agreeing

to rig bids and fix prices of commercial flooring services and products sold in the United States.

118. The DOJ's criminal charges against Vortex Commercial Flooring alleged that the company and its executives carried out a criminal conspiracy by: (i) attending meetings and participating in private conversations to discuss methods for rigging bids and fixing prices of commercial flooring services and products; (ii) reaching an agreement to rig bids and fix prices of commercial flooring services and products sold in the United States; (iii) exchanging pricing and other confidential information to facilitate coordination for commercial flooring services and products to be sold in the Unites States; (iv) allocating potential customers and markets by determining in advance which flooring co-conspirator would win a particular project or business; (v) soliciting noncompetitive, complementary bids to provide commercial flooring services and products to potential customers; (vi) submitting noncompetitive, complementary bids in furtherance of the Conspiracy; (vii) selling commercial flooring services and products at collusive and noncompetitive prices in accordance with the Conspiracy; and (viii) engaging in conversations and other communications for the purpose of monitoring and enforcing adherence to the Conspiracy. According to the DOJ, Vortex Commercial Flooring has agreed to plead guilty to the criminal price-fixing charges.

119. The DOJ's charging document against Vortex Commercial Flooring and its executives also disclosed that the government is investigating several other unnamed co-conspirator commercial flooring providers: Company A, Company C, Company E, Company G and Company H. The DOJ further disclosed that these unnamed co-conspirators are Illinois entities with principal places of business in this District and performed acts in furtherance of the alleged antitrust Conspiracy.

120. On November 18, 2020, Vortex Commercial Flooring's former owner and president, Defendant Church, pled guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to rig bids and fix prices of commercial flooring services and products sold in the United States in violation of the Sherman Antitrust Act. Pursuant to his plea agreement, the DOJ will ask the Court to order Church to pay a $75,280 criminal fine and receive a prison sentence of 14 months. Further, Church has agreed to cooperate with the DOJ as it continues to investigate bid rigging, price fixing and other anticompetitive conduct in the commercial flooring industry.

121. In a DOJ press release issued in connection with Church's guilty plea, Assistant Attorney General Makan Delrahim stated that "[t]he recent guilty plea—a plea from the highest-ranking executive to date—marks the continued progress of the latest milestone in this investigation. The Antitrust Division and its law enforcement partners are committed to holding responsible the most-senior culpable individuals that engage in and direct harmful bid rigging conspiracies."

122. The DOJ's criminal charges and Defendants' guilty pleas are merely the tip of the iceberg. The government's antitrust investigations have uncovered the existence of a well-coordinated and long-running series of schemes to rig bids and fix the prices of commercial flooring services and products sold in the United States. Plaintiff does not yet have access to all the of the information available to the DOJ. However, what is known in light of the evidence described above is that numerous bids were rigged and prices were fixed through specific acts of unlawful collusion by Defendants and their co-conspirators.

## VIII.  ANTITRUST INJURY

123.    Defendants' conspiracy caused injury to Plaintiff and members of the Class by suppressing price competition among providers of commercial flooring services and products, thereby depriving all direct purchasers of commercial flooring services and products the benefits of a competitive market, and resulted in the setting of prices at artificially high levels.

124.    As a direct result of Defendants' conspiracy, Plaintiff and members of the Class have been injured in their business or property in that they paid more for commercial flooring services and products than otherwise would have been the case in a competitive market.

125.    Defendants knew and intended that their pricing actions relating to their sale of commercial flooring services and products would have a direct impact on prices for all direct purchasers of commercial flooring services and products throughout the United States.

## IX.     DEFENDANTS ACTIVELY CONCEALED THEIR CRIMINAL CONSPIRACY

126.    Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class from at least January 1, 2009 through at least April 3, 2019, when the DOJ antitrust investigations of providers of commercial flooring services and products became public. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least April 3, 2019.

127.    Defendants and their co-conspirators' successful contract, combination or conspiracy was by its nature inherently self-concealing.

128.    Defendants and their co-conspirators represented publicly, both to customers and otherwise, that their pricing activities were unilateral and independent. In making those false

representations, Defendants misled Plaintiff and members of the Class as to the true, collusive and coordinated nature of their price-fixing activities.

129.    Defendants' and their co-conspirators' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

130.    In particular, Defendants and their co-conspirators participated in private meetings, conversations and communications to discuss bid rigging, price-fixing and customer and jobsite allocation that affected customers throughout the United States. During these secret meetings, conversations and communications, Defendants and their co-conspirators agreed to rig bids and fix prices for prospective commercial flooring customers throughout the United States.

131.    As a result of their secret coordinated actions, and unbeknownst to Plaintiff and the Class, Defendants and their co-conspirators sold commercial flooring services and products to purchasers in the United States at collusive and supracompetitive prices.

132.    Despite due diligence, Plaintiff had no knowledge of Defendants' and their co-conspirators' unlawful contract, combination or conspiracy.

133.    Plaintiff received pricing information from one or more of Defendants or their co-conspirators. Plaintiff had no way to know the bids it received were rigged and the prices were higher than they should have been due to the unlawful Conspiracy alleged herein.

134.    Plaintiff did not discover and could not have discovered Defendants' and their co-conspirators' unlawful contract, combination or conspiracy at any earlier date, despite due diligence. Defendants and their co-conspirators undertook affirmative acts of concealment of their contract, combination or conspiracy, including attending secret meetings, exchanging confidential pricing information, making misrepresentations to Plaintiff and the Class of the reasons for the

prices charged and engaging in secret conversations concerning the bid rigging and price fixing of commercial flooring services and products.

## X.     CLASS ACTION ALLEGATIONS

135.    Plaintiff brings this action both on behalf of itself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3). The Class is defined as follows:

> All persons and entities who purchased commercial flooring services and products in the United States directly from one or more of the Defendants or their co-conspirators (or any controlled subsidiary, affiliate, or joint venture) from at least January 1, 2009 through the present.

> Specifically excluded from this Class are Defendants, their officers, directors or employees, any entity in which a Defendant has a controlling interest and any affiliate, legal representative, heir or assign of a Defendant. Also excluded from this Class are any judicial officers presiding over this action, the members of the judicial officer's immediate family and staff and any juror assigned to this action.

136.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

137.    <u>Class Identity</u>: The Class is readily identifiable and one for which adequate records exist.

138.    <u>Numerosity</u>: The members of the Class are so numerous that their individual joinder is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes there are hundreds of Class members. The precise number or identification of Class members is presently unknown to Plaintiff, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings and publication.

139.    Typicality: Plaintiff's claims are typical of the claims of the Class members because Plaintiff purchased commercial flooring services and products directly from one or more Defendant during the Class Period and has been injured in the same way—by paying more for commercial flooring services and products than it would have but for Defendants' Conspiracy. Plaintiff's claims arise from the same common course of conduct, give rise to the same claims of injury and seek the same relief as those of the other Class members.

140.    Common Questions Predominate: Questions of law and fact common to the Class, which generate common answers, include but are not limited to:

a.      Whether Defendants and their co-conspirators engaged in an agreement, combination or conspiracy to rig bids and fix, raise, elevate, maintain or stabilize prices of commercial flooring services and products sold in interstate commerce in the United States;

b.      The identity of the participants of the Conspiracy;

c.      The duration of the Conspiracy;

d.      The acts performed by Defendants and their co-conspirators in furtherance of the Conspiracy;

e.      Whether the Conspiracy violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

f.      The effect of the Conspiracy on the price of commercial flooring services and products sold in the United States during the Class Period;

g.      Whether Plaintiff and other Class members suffered antitrust injury as a result of the Conspiracy;

h.      The appropriate measure of damages for injuries suffered by Plaintiff and other Class members; and

i.      Whether Plaintiff and other Class members are entitled to injunctive relief, and the nature and extent of such injunctive relief.

141.    These and other questions of law and fact common to all members of the Class predominate over questions affecting only individual members of the Class.

142.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff's interests are aligned with, and are not antagonistic to, those of the other Class members. Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent them and the Class.

143.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons: (i) individual joinder of all Class members is impractical; (ii) prosecution as a class action will eliminate the possibility of duplicative litigation; (iii) prosecution of separate actions by individual Class members would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action; (iv) the relatively small amount of damages suffered by individual Class members, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (v) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

144.    In addition, Defendants have acted on grounds generally applicable to the Class, making final injunctive relief appropriate for the Class as a whole.

## XI.  CLAIM FOR RELIEF
## VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)

145.   Plaintiff incorporates and realleges every allegation set forth in the preceding paragraphs of this Complaint.

146.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize prices for commercial flooring services and products sold in the United States and to allocate jobsites and customers for commercial flooring services and products sold in the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

147.   The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained or stabilized prices, and allocated jobsites and customers, for commercial flooring services and products sold in or into the United States. Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws.

148.   Defendants succeeded in fixing, raising, maintaining and stabilizing the prices as well as allocating jobsites and customers for commercial flooring services and products sold in the United States during the Class Period.

149.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

150.   For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

a. Restraining trade or commerce by fixing, controlling or maintaining, at artificial and supracompetitive levels, the prices at which commercial flooring services and products were sold in the United States;

b. Depriving direct purchasers of commercial flooring services and products of free and open competition;

c. Selling commercial flooring services and products to direct purchasers in the United States at supracompetitive prices; and

d. Employing measures to conceal the true nature of their unlawful conduct from Plaintiff and other members of the Class in furtherance of the conspiracy.

151. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid significantly higher prices for commercial flooring services and products than they otherwise would have paid in a competitive market.

## XII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and other members of the Class, requests that the Court grant the following relief:

A. Determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class representative and its counsel of record as Class counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. Adjudge that the Conspiracy and the acts done by Defendants and their co-conspirators in furtherance thereof constitute a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C. Enter judgment for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and other Class members as a result of

Defendants' violations of Section 1 of the Sherman Antitrust Act and costs of this action, including reasonable attorneys' fees, as permitted in Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

D.     Award Plaintiff and the members of the Class pre-judgment and post-judgment interest at the highest legal rate from commencement of this proceeding, to the extent allowed by law;

E.     Permanently enjoin Defendants and their co-conspirators, their respective affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining or renewing the conduct, conspiracy or combination and from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect caused by any further violation of the antitrust laws; and

F.     Such other and further relief as the Court may deem just and proper under the circumstances.

## XIII.  JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: December 18, 2020                Respectfully submitted,

                                        By:  */s/ Michael L. Silverman*

                                        Michael L. Silverman
                                        Klint L. Bruno
                                        THE BRUNO FIRM, LLC
                                        205 North Michigan Avenue, Suite 810
                                        Chicago, Illinois 60601
                                        Telephone: (312) 321-6481

msilverman@brunolawus.com
kbruno@brunolawus.com

Steven A. Kanner
Michael J. Freed
Brian M. Hogan
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
mfreed@fklmlaw.com
bhogan@fklmlaw.com

*Counsel for Plaintiff and the Proposed Class*